

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

August 22, 1957

Honorable Zollie Steakley
Secretary of State
Capitol Station
Austin, Texas

Opinion No. WW-232

Re: Proper construction
and constitutionality
of H. B. 11, Acts of
55th Legislature,
Regular Session, 1957,
Chapter 420, page
1259, which defines
and regulates the
business of giving
bail.

Dear Mr. Steakley:

In your letter of July 29, 1957, you request an opinion of this office "concerning the proper construction and constitutionality of House Bill No. 11, in view of the language ' any county having within its boundaries a city with a population of three hundred fifty thousand (350,000) inhabitants.'"

You point out in your letter that under Senate Bill No. 294, Acts of the 55th Legislature, Regular Session, 1957, Chapter 269, page 575, effective August 22, 1957, the Administrator of the Securities Division of the Secretary of State will be succeeded by the Securities Commissioner appointed by the newly created Securities Board, and thus the Securities Commissioner will be charged with the administration of House Bill No. 11, which likewise becomes effective on August 22, 1957. Hence, it becomes important for you to know in advance whether the provisions of House Bill No. 11 are constitutional in order to effectuate a transition and in order to prepare forms and otherwise implement the law, if it is valid.

The caption of House Bill No. 11 recites that it is:

> "An Act defining and regulating the
> business of giving bail in criminal
> and quasi-criminal cases; providing
> for the licensing of person, firms
> and corporations who engage in that
> business in any county having within

its boundaries a city with a popula-
tion of three hundred and fifty
thousand (350,000) inhabitants accord-
ing to the last preceding Federal
Census; providing certain penalties;
providing certain exemptions from
this Act; providing for appeal from
the decision of the Administrator
of the Securities Division of the
Office of the Secretary of State;
providing for administration of
this Act by the successor to the
Administrator of the Securities
Division of the Office of the Secre-
tary of State; providing for licensing
fees; and declaring an emergency."

Section 1 of the Bill defines the business of
giving bail and exempts lawyers and certain surety
companies from the provisions of the Act.

Section 2 declares that the business of giving
bail is a business affected with public interest,
and, as such, is subject to be regulated and controlled.

Section 3 authorizes any Court, Judge, Justice
of the Peace or other officer or person authorized by
law to accept bail, to examine under oath any prospec-
tive bondsmen and to refuse to accept bond under
certain circumstances.

Section 4 reads as follows:

"Sec. 4.   No person, firm or corpora-
tion shall engage in the business of
making bail within any county con-
taining a city of three hundred and
fifty thousand (350,000) inhabitants,
as shown by the last preceding Federal
Census, without having first been
licensed thereto by the Administrator
of the Securities Division of the
Office of the Secretary of State; nor
shall any person, firm, or corporation
be permitted to engage in such business
if such person or any member of such
firm, or officer or director of such
corporation shall have been convicted
of any felony, or of any misdemeanor
involving moral turpitude, in this or

any other state, or in any Federal
Court."

Section 5 empowers the Administrator of the Securities Division of the Office of Secretary of State to administer oath and examine witnesses, and to investigate anyone engaged in the business of "the making of bail in this state."

Section 6 reads in part as follows:

"Sec. 6. Any applicant desiring to
engage in the business of giving
bail as defined in this Act, in any
county having within its boundaries
a city with a population of three
hundred and fifty thousand (350,000)
inhabitants according to the last
preceding Federal Census, shall
file with the Administrator of the
Securities Division a sworn appli-
cation for a license therefor. ..."

The remainder of this Section deals with the contents of the application.

Section 7 authorizes the Administrator to collect license fees.

Section 8 provides for the renewal of licenses. Section 8a provides for the succession of the duties of the Administrator to his successor in office or any other person who may hereafter assume his duties.

Section 9 authorizes the revocation or suspension of licenses by the Administrator for certain causes, and sets up the procedure for such suspension and revocation.

Section 10 requires a bond of all licensees.

Section 11 provides in part as follows:

"Sec. 11. Any person, firm or corpora-
tion or agent or employee thereof who
shall willfully violate or fail or
neglect to obey, observe or comply
with any lawful order, permit, decision,
demand or requirement of the Adminis-
trator of the Securities Division under

this Act as herein provided shall be guilty of a misdemeanor and upon conviction therefor shall be sentenced to pay a fine of not more than Five Hundred Dollars ($500), or imprisonment in the county jail for not more than one (1) year, or both such fine and imprisonment."

Subdivision (a) under Section 11 makes it an offense for any person coming within the purview of the Act to solicit "the privilege of writing or making bond for any person charged with any criminal or quasi-criminal offense". Subdivision (b) makes it an offense to recommend or suggest the name of an attorney to such person.

Section 12 provides as follows:

"Sec. 12. If any Section, Subsection or requirement of this Act shall for any reason be adjudged to be unconstitutional, such adjudication shall not affect the validity of the remaining portions of said Act. The Legislature hereby declares that it would have passed the Act and each Section, Subsection and requirement thereof irrespective of the fact that any one or more Sections, Subsections or requirements be declared unconstitutional."

Section 13 provides as follows:

"Sec. 13. No person, firm or corporation whose application for license to engage in making bail shall have been refused shall be eligible to make or renew such application for license for a period of one (1) year from the date of his or its prior rejection."

Section 14 reads in part as follows:

"Sec. 14. The fact that there is an unprecedented increase in the number of forfeited recognizance and bail bonds in criminal cases and that there

are no adequate laws regulating the
business of giving bail, creates an
emergency.   . . ."

The language appearing in Sections 4 and 6 gives
rise to the question, whether the Legislature intended
for those Sections of the Act to be effective only
in counties having a city with exactly 350,000 inhabi-
tants, or whether it intended the Act to be effective
in all counties of the state having a city of 350,000
inhabitants or more.  According to the last Federal
census there is no city in Texas with exactly 350,000
inhabitants.  We must assume the Legislature knew such
fact.  It has been said, "By well-settled rules of
law the Legislature, when it came to act upon this
matter, was charged with knowledge of these facts
particularly."  State v. Hall, 76 S.W. 2d 880, 884
(Civ. App. 1934, writ dism.) holding the Act authorizing
a code of fair competition for milk industry in counties
of more than 350,000 population to be unconstitutional
under Section 56 of Article III of the Constitution of
Texas.

However, it is a maxim of statutory construction
that a useless or ineffective Act will not be attributed
to the Legislature where any reasonable interpretation
may render the Act effective.  The Legislature in this
case is presumed to know that there is no city in the
State of Texas presently falling within the group of
cities which have exactly 350,000 population.  If we
were to construe this Act as applying only to those
counties containing a city which has exactly 350,000
population, we would be making ineffective the whole
of this Act for all practical purposes in view of
the extreme unlikelihood of any city in Texas ever
having a population of exactly 350,000 according to
any Federal census.  If we were to hold that the
Legislature intended the Act to apply only to counties
having within their boundaires a city of exactly
350,000, the classification as a matter of law would
be unreasonable and we would be compelled to delcare
it unconstitutional as violative of Section 56 of
Article III of the Texas Constitution, or as an un-
reasonable exercise of the police power.  Obviously,
the Legislature could not have intended that the Act
be construed in a manner which would render it
unconstitutional.

We think the Legislature intended this Act to
apply to cities having a population of 350,000 or over

and we so interpret the provision set out in the first paragraph of this opinion. We think that, viewing the Act as a whole, it is not a strained or unusual interpretation to hold as we do that the Act applies to any county having within its boundaries a city with a population of 350,000 inhabitants or more.

Having concluded that the segment involved includes those counties containing a city having a population of 350,000 or over, the question arises as to whether or not this Act is a local or special bill within the meaning of Section 56 of Article III of the Texas Constitution.

Two cases concerning the regulation of trades or professions by classifications according to population have been considered by the Texas Courts. In State v. Hall, supra, the Court considered a statute authorizing a code of fair competition for milk industries in counties of more than 350,000 population. This statute was to be effective for two years and the 350,000 population was to be determined by the last preceding Federal census. The Court held this statute unconstitutional as being a local or special law regulating a trade within the meaning of Section 56 of Article III of the Texas Consitution. This decision was based on the fact (1) Harris County was the only county included within the classification adopted in the Act and (2) because of the operation of the federal laws relating to the decennial census, this county was the only one which could ever enjoy or endure the provisions of this law.

The other case on the question is O'Brien v. Amerman, 247 S.W. 270 (Tex. Sup. Ct. 1922), concerning the statute enacted by the Legislature allowing cities having a population of 100,000 or more, situated on a navigable stream, owning and operating municipal docks, wharves, or warehouses, to license, appoint, and remove pilots on the waterway connecting the city and the Gulf. The Court upheld this statute as a valid exercise of the Legislative power, saying:

> "The articles are not confined, by their terms, to any particular city or waterways. The law is instead general. True it is that the rights and powers granted by the articles are to be exercised only by officers of cities meeting these

tests: First, having a population of 100,000 or more; second, being situated along or upon a navigable stream in the state; and third, owning or operating municipal docks, wharves, or warehouses. Though no other city except Houston meets these requirements at this time, the law is applicable to any other city which may hereafter meet them. There is no foundation whatever for holding that the law was put in a general form merely to evade the Constitution. There are such substantial grounds for the classification made that the articles would stand the test of the strictest rule applied in such an inquiry. The Legislature might reasonably conclude that the officials of a port city of 100,000 population or over, maintaining its own docks, wharves, or warehouses, would have so special an interest in safeguarding and maintaining the port's commercial interests, that the state could best intrust to them such matters as to appoint, suspend, and remove pilots on the waterway connecting the city and the Gulf, and to make reasonable regulations pertaining to the pilots' services. It seems obvious that the number of pilots and the need of careful and strict supervision of pilotage would increase with the size of the port and the extension of its terminal water transportation facilities. Classification of pilots according to port, population and municipal terminal facilities, having a reasonable basis and operating uniformly on those coming within the same class, violates no provision of the Constitution. . . ."

We think the classification adopted by the Legislature in the Act under consideration cannot be said to be unreasonable as a matter of law under the holding of the O'Brien case. It would appear that the evils accompanying the misuse of the making of bail bonds bears a real relation to the population of the metropolitan areas covered by the Legislature in this Act and that such population affords a fair basis for the classification made. We think it may well be said that the problems sought to be remedied by the Legislature are proportionately more prevalent in the metropolitan areas of the state. In the absence of a

clearly unreasonable classification, we conclude that
the Act is a general law and does not come under the
prohibitions of Section 56 of Article III of the
Texas Constitution. O'Brien v. Amerman, supra.

The remaining question is whether the Act
constitutes a valid exercise of the police power
of the State. There cannot be much question but
that the regulation of an activity affecting the
administration of justice constitutes a valid
exercise of the police power of the State. If a
reasonable relation may be ascertained between
the classification adopted by the Legislature and
the problem or evil to be remedied, the statute is
not to fall merely because certain persons are
included or excluded in that classification.
San Antonio Retail Grocers v. Lafferty, 297 S.W.
2d 813 (Tex. Sup. Ct. 1957).

We have already concluded that the classifi-
cation adopted by the Legislature is reasonable and
appropriate to remedying the evils it purports to
remedy. Therefore, we are not able to say that
the classification does not bear a reasonable
relationship to the evils to be remedied. Unless
we are able to so conclude, we may not declare the
Act unconstitutional. See San Antonio Retail
Grocers v. Lafferty, supra.

The exception in the case of licensed attor-
neys and surety companies regulated by the Board of
Insurance Commissioners or the Banking Commission
would not affect the constitutionality of the Act,
since it merely excludes from its terms those who
are already regulated or licensed for the protection
of the public. Neither does the Act affect the
administration of justice in the Courts, since it
only restricts those persons who are in the business
of professional bondmaking. It does not affect the
right of a person to bond nor to the right of the
courts to release a person on bond.

In summary we conclude that the Act applies
to any county with a city having a population of
350,000 inhabitants or more. Further, we do not
think that this Act violates the provisions of
Section 56, Article III, concerning local or special
laws. Neither do we think the classification adopted
by the Legislature is unreasonable when considered
in the light of the evils it seeks to remedy.

## SUMMARY

House Bill 11, Acts 55th Legislature, Regular Session, 1957, chapter 420, p. 1259 applies to counties having within their boundaries a city of 350,000 or more inhabitants. This Act is not unconstitutional because of the terms of Article III, Section 56, Texas Constitution, and is not invalid as an unreasonable exercise of the police power of the State.

Very truly yours,

WILL WILSON
Attorney General of Texas

By _John H. Minton, Jr._
John H. Minton, Jr.
Assistant

JHM:wam:jas

APPROVED:

OPINION COMMITTEE

H. Grady Chandler, Chm.
B. H. Timmins, Jr.
Mary K. Wall
Roger I. Daily
W. R. Hemphill

REVIEWED FOR THE ATTORNEY GENERAL
BY: Geo. P. Blackburn